JOSEPH P. RUSSONIELLO (CSBN 44332)
United States Attorney

BRIAN J. STRETCH (CSBN 163973)
Chief, Criminal Division

ALLISON MARSTON DANNER (CSBN 195046)
Assistant United States Attorney

  450 Golden Gate Avenue, Box 36055
  San Francisco, California 94102-3495
  Telephone: (415) 436-7144
  Fax: (415) 436-7234
  Email: allison.danner@usdoj.gov

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN THE MATTER OF THE THE EXTRADITION OF ALFONSO SOSA CORDERO<br><br><br><br><br><br> ) ) ) ) ) ) ) ) ) | No. CR 08-90417 MISC (JCE)<br><br>UNITED STATES' MEMORANDUM RE: AVAILABILITY OF BAIL |

The United States hereby files this memorandum regarding the availability of bail in this matter. As set forth in more detail below, bail is available in extradition matters only in "special circumstances." The United States is not aware that any such special circumstances exist here.

## FACTUAL BACKGROUND

This case involves the request by the Government of Mexico to the United States for the extradition of Alfonso Sosa Cordero. The charge for which Mexico seeks extradition is attempted murder. The case is of importance to the Government of Mexico and bears on the United States' foreign policy interests, specifically, its ability to comply with its obligations under the outstanding extradition treaty with Mexico.

**A.    Charges Pending Against Sosa-Cordero in Mexico.**

According to the information provided by Mexico, Sosa Cordero is charged in Mexico

1  with attempted murder, covered and punishable under Articles 123 and 124 of the Penal Code of
2  the State of Baja California.  On June 20, 2001, the Trial Judge of the Judicial District of
3  Tijuana, Baja, California issued a warrant for the arrest of Alfonso Sosa Cordero in criminal case
4  number 309/2002.

5  **B.    The Facts of the Case.**

6         As set forth in formal papers presented by Mexico, on June 1, 2001, the David William
7  Lohrey was walking down an alley behind Sanborns restaurant in Tijuana, Mexico.  Lohrey later
8  told police that he felt someone pull him from behind.  Lohrey recognized that person as Sosa
9  Cordero, whom he had had problems with in the past and who had previously threatened to kill
10 him.  Lohrey told police that Sosa Cordero started beating him by punching Lohrey in the
11 stomach and saying "Now you are really going to die you son of a bitch, you're not going to
12 escape."  Lohrey stated that he lost consciousness as Sosa Cordero choked him.  Lohrey then
13 work up as Francisco Ochoa Rangel, a man Lohrey had hired as his bodyguard, was picking him
14 up.  Lohrey and Rangel sought assistance from police, but the perpetrators fled the scene in a
15 dark blue car before they could be apprehended.

16        Authenticated medical records dated June 1, 2001 from the hospital that treated Lohrey
17 stated that he had non-life-threatening wounds that required hospitalization.

18        Francisco Ochoa Rangel told the police that he was Lohrey's bodyguard the day that
19 Lohrey was attacked.  (Lohrey worked for Servicions de Prevencion Profesional S.A., a security
20 service that Lohrey hired each time he came to Tijuana).  Rangel was working for Lohrey when
21 he drove him to Sanborns restauraunt for a meeting with two other people.  When Lohrey and
22 Rangel were leaving the restaurant, Lohrey asked Rangel to go back inside the restaurant to
23 retrieve Lohrey's cell phone, which he had left inside.  When Rangel emerged from the
24 restaurant, he saw a person strangling Lohrey and two other people beating someone else.
25 Rangel went to defend Lohrey, and the perpetrato's fled in a dark blue car.

26        Homicide is an extraditable offense under Article 2, Paragraph 4, Appendix Item 1, of the
27 Extradition Treaty between the United States and Mexico.

28

1

**DISCUSSION**

2   A.    **Standards Governing Bail in Extradition Proceedings.**

3          It is well established that bail is not generally available in extradition cases and that, if

4   bail is granted, it should only be when "special circumstances" exist.  As set forth in more detail

5   below, "[u]nlike the situation for domestic crimes, there is no presumption favoring bail [in

6   international extradition].  The reverse is rather the case." *Matter of Extradition of Russell*, 805

7   F.2d 1215, 1216 (5th Cir. 1986) (quoting *Beaulieu v. Hartigan*, 554 F.2d 1, 2 (1st Cir. 1977)); *see*

8   *also Matter of Requested Extradition of Kirby*, 106 F.3d 855, 858 (9th Cir. 1997) ("As the United

9   States points out, this presumption against bail [in extradition proceedings] is contrary to the

10  presumption that favors bail in domestic prosecutions.") (citation omitted).

11         1.     No Constitutional or Statutory Right to Bail.

12         There is no constitutional or statutory right to bail in extradition proceedings.   As an

13  initial matter, the Eighth Amendment to the Constitution requires only that bail, if granted, not be

14  excessive.[1]  Further, the Bail Reform Act and decisions involving pre-trial release apply only to

15  criminal cases.  *In re Extradition of Mironescu*, 296 F. Supp.2d 632, 634 (M.D.N.C. 2003)

16  ("Because an international extradition proceeding is not a criminal case, the Bail Reform

17  Act . . . does not apply.").

18         2.     International Considerations Generally Counsel Against Granting Bail.

19         Although bail in extradition proceedings involves some of the same considerations as in

20  ordinary criminal cases, it differs in one extremely significant respect: the international

21  implications of a failure to deliver a fugitive.  *In re Extradition of Molnar*, 182 F. Supp.2d 684,

22  686–87 (N.D. Ill. 2002).   The reason for distinguishing granting release in extradition cases from

23  federal criminal cases is that extradition cases involve an overriding interest in meeting treaty

24  obligations.  "As one court has put it, "[i]f the United States were to release a foreign fugitive

25  pending extradition and the defendant absconded, the resulting diplomatic embarrassment would

26

27         [1]  A related claim, based on an asserted due process right to bail by aliens in deportation
    proceedings, has been rejected by a New York court.  *See Doherty v. Thornburgh*, 750 F. Supp.
28  131, 135–38 (S.D.N.Y. 1990) (analyzing the concept and discussing the cases).

1  have an effect on foreign relations and the ability of the United States to obtain extradition of its

2  fugitives." *United States v. Taitz*, 130 F.R.D. 442, 444 (S.D. Cal. 1990) (citation omitted).

3          Simply put, the international legal system depends wholly on the respect of its members

4  for the obligations into which they freely enter.  The axiom *pacta sunt servanda* — treaties must

5  be obeyed — lies at the heart of the system.  A nation that fails to perform a duty mandated by a

6  treaty can justly be accused of subverting the system and may find itself receiving reciprocal

7  treatment from its treaty partner.

8          Extradition treaties are written so that delivery of fugitives by the United States pursuant

9  to an extradition request is not optional:  if the requesting state meets the conditions specified in

10 the treaty, the United States is obligated to deliver the fugitive.  This obligation cannot be

11 fulfilled if the fugitive skips bail after being released from custody.  In fora throughout the world,

12 the United States vigorously advocates extradition as a means to combat all forms of serious

13 lawlessness.[2]  Thus, the United States' ability to deliver fugitives pursuant to extradition requests

14 is subject to special scrutiny worldwide and is of great importance to our national interest.

15         Given the potentially serious consequences on the foreign relations of the United States

16 and the inherent unreliability of fleeing felons, most courts will not grant bail to fugitives absent

17 special circumstances.  *See United States v. Williams*, 611 F.2d 914, 914–15 (1st Cir. 1979).

18 Some courts characterize this reluctance as a presumption against bail for fugitives.  *See, e.g.,*

19 *United States v. Messina*, 566 F. Supp.740, 742 (S.D.N.Y. 1983).  Whatever the name of the

20 policy, it derives from a single source:  the conviction that the interest of the United States in

21 living up to its treaty obligations, coupled with the risk of flight inherent in all extradition cases,

22 outweighs any factors that might be advanced in favor of release in all but the most unusual

23 cases.  As set forth in more detail in the next section, even if a fugitive is not considered a flight

24 risk by the United States, the fugitive must establish the existence of "special circumstances" that

25 would warrant his release.  *Molnar,* 182 F. Supp.2d at 686 (citing *Salerno v. United States*, 878

26 _____

27          [2] U.S. domestic law nevertheless recognizes an exception under which the Secretary of
State may deny extradition for compelling reasons even when the treaty's conditions have been

28 fulfilled.  *See Escobedo v. United States*, 623 F.2d 1098,1105 n.20 (5th Cir. 1980).

1    F.2d 317 (9th Cir. 1989)).

2           3.    <u>"Special Circumstances" are Required for a Fugitive to be Released on Bail.</u>

3          The general unavailability of release in extradition cases has been authoritatively settled

4    by the United States Supreme Court since 1903.  In *Wright v. Henkel*, 190 U.S. 40, 63 (1903), the

5    Supreme Court held:

6            Not only is there no statute providing for admission to bail in cases of foreign
     extradition, but § 5270 of the Revised Statutes (U. S. Comp. Stat. 1901, p. 3591),

7            is inconsistent with its allowance after committal, for it is there provided that, if
     he finds the evidence sufficient, the commissioner or judge "shall issue his

8            warrant for the commitment of the person so charged to the proper jail, there to
     remain until such surrender shall be made."

9                                     * * *

10           The demanding government, when it has done all that the treaty and the

11           law require it to do, is entitled to the delivery of the accused on the issue of the
     proper warrant, and the other government is under obligation to make the

12           surrender; an obligation which it might be impossible to fulfil if release on bail
     were permitted.  The enforcement of the bond, if forfeited, would hardly meet the

13           international demand; and the regaining of the custody of the accused obviously
     would be surrounded with serious embarrassment.  And the same reasons which

14           induced the language used in the statute would seem generally applicable to
     release pending examination.

15

16   *Id.* at 61–62; *see also Salerno v. United States*, 878 F.2d 317, 317 (9th Cir. 1989) ("There is a

17   presumption against bail in an extradition case and only 'special circumstances' will justify

18   bail.") (quoting *Wright v. Henkel*, 190 U.S. 40, 63 (1903)); *see also Kirby*, 106 F.3d at 858

19   (same).  "Special circumstances" are "'only [] the most pressing circumstances, and when the

20   requirements of justice are absolutely peremptory.'"  *United States v. Leitner*, 784 F.2d 159, 160

21   (2d Cir. 1986) (quoting *In re Mitchell*, 171 F. 289, 289 (S.D.N.Y. 1909) (L. Hand, J.)).  Despite

22   the age of the *Wright* decision, it still provides the standard for admission to bail pending

23   extradition.  Even though laws have been updated and procedures re-codified since 1903, *see* 18

24   U.S.C. § 3181 *et seq.*, there still is no statute that admits an extraditee to bail, and the

25   requirement of a showing of "special circumstances" is still mandated by *Wright* and its progeny.

26         The "special circumstances" doctrine creates a presumption contrary to the presumption

27   operating in domestic prosecutions, where, as noted above, pre-trial bail is the favored course.

28   *Beaulieu*, 554 F.2d at 2 ("Unlike the situation for domestic crimes, there is no presumption

1  favoring bail.  The reverse is rather the case.").  As noted above, the anti-bail presumption in

2  extradition cases is grounded in the strong foreign policy interests inherent in the extradition

3  relationship between the United States and its treaty partners.  If a domestically-charged person is

4  released and flees before trial he thwarts the court's ability to enforce our criminal laws.  That

5  potential harm is balanced against his presumption of innocence.  In this matter, however, Sosa-

6  Cordero is wanted by the Government of Mexico for charges there.  Consequently, there is

7  significantly greater potential harm if he flees before his extradition hearing can be held.  Sosa-

8  Cordero's flight would defeat Mexico's ability to enforce its laws, subject the United States to

9  embarrassment, and damage our foreign policy interests by rendering us unable to meet our treaty

10  obligation to extradite him to Mexico.  *See, e.g., Wright v. Henkel*, 190 U.S. at 62; *In re Klein*, 46

11  F.2d 85, 85 (S.D.N.Y. 1930) (noting the "grave risk of frustrating the efforts of the executive

12  branch of the government to fulfill treaty obligations").[3]

13      Although the case law is somewhat unclear as to what constitutes "special

14  circumstances," it is clear that such "special circumstances" are limited to extraordinarily rare

15  situations, or, in the words of Judge Learned Hand, "the most pressing circumstances and when

16  the requirements of justice are absolutely peremptory."  *In re Mitchell*, 171 F. 289, 289

17  (S.D.N.Y. 1909).  On the government's appeal, the Ninth Circuit has underscored the principle

18  that fugitives arrested in connection with foreign extradition requests should be denied bail

19

20  [3]The continued vitality of the "special circumstances" test has been confirmed in cases
21  such as *Hu Yau-Leung v. Soscia*, 649 F.2d 914 (2d Cir. 1981).  In that case, the Court of Appeals
    for the Second Circuit held:

22
23          The government also asks us to review and vacate the district court's grant
            of Hu's release on bail.  We agree with the government that the standard for
24          release on bail for persons involved in extradition proceedings is a more
            demanding standard than that for ordinary accused criminals awaiting trial.
25          *Wright v. Henkel, supra*, 190 U.S. at 62, 23 S. Ct. at 786; *Beaulieu v. Hartigan*,
            554 F.2d 1 (1st Cir. 1977).  We recognize that, because of the treaty obligations of
26          the United States, there is a presumption against bail in the former situation, and
            only "special circumstances" will justify bail.  *Wright v. Henkel, supra*; *United*
27          *States v. Williams*, 611 F.2d 914 (1st  Cir. 1979); *Beaulieu v. Hartigan, supra; In*
            *Re Mitchell*, 171 F. 289 (S.D.N.Y. 1909).
28

USA'S MEMORANDUM RE: BAIL
CR 08-90417 MISC (JCS)              -6-

absent "special circumstances." *United States v. Smyth*, 976 F.2d 1535, 1535–36 (9th Cir. 1992).

Individuals wanted for extradition often cite the need to consult with counsel, gather evidence, and confer with witnesses in preparation for their hearing as facts supporting a "special circumstances" finding. However, these needs do not support a motion for release as they are "important" but "not extraordinary," since "all incarcerated defendants need to do these things." *United States v. Smyth*, 976 F.2d 1535, 1535–36 (9th Cir. 1992); *see also Koskotas v. Roche*, 931 F.2d 169, 175 (1st Cir. 1991) (need to assist in preparation of defense insufficient to justify release). Other factors that do not amount to "special circumstances" include: (1) an unblemished record and the ability to post a significant bond; (2) the fugitive being a highly trained doctor available to administer care to the public; (3) the discomfort of sitting in jail; (4) the need to consult with one's attorney about pending civil litigation, the present extradition hearing, and severe financial and emotional hardships; (5) advanced age or infirmity; (6) the need for a special diet; (7) no credit for time served; (8) financial or family hardship; or (9) the complicated nature of extradition proceedings. *Kirby*, 106 F.3d at 863; *Russell*, 805 F.2d at 1217; *Molnar*, 182 F. Supp.2d at 688.

Courts have found special circumstances to exist where fugitives have shown a high probability of their success in the extradition hearing, a serious deterioration of health, an unusual delay in the proceedings, reason to believe the charges cannot be supported under the Treaty, the availability of bail for a crime charged in the requesting country, and a combination of other factors (including the general "uniqueness" of a case). *Molnar*, 182 F. Supp. 688–89; *Kirby*, 106 F.3d at 864–65. These circumstances are not present in this case.

///

///

///

///

///

//

1

2                                          **<u>CONCLUSION</u>**

3          For all of the reasons set forth above, the United States will respectfully request that this

4    Court deny any motion made by Sosa-Cordero for release.

5

6    DATED:  August 29, 2008                    Respectfully submitted,

7                                               JOSEPH P. RUSSONIELLO
                                                United States Attorney
8

9                                               _____\s\_  Allison Danner_____
10                                              ALLISON MARSTON DANNER
                                                Assistant United States Attorney
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

USA'S MEMORANDUM RE: BAIL
CR 08-90417 MISC (JCS)                    -8-